UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


DEBTOR:                          JAMES LEE SIMPSON

CASE NO.:                        15-40012-KKS

_____

PROCEEDINGS:                     Creditors Meeting

BEFORE:                          TRUSTEE WALTER W. KELLEY

DATE:                            Tuesday, February 4, 2015

TIME:                            Commenced at 10:00 a.m.
                                 Concluded at 11:41 a.m.

LOCATION:                        110 E. Park Avenue
                                 Tallahassee, FL

REPORTED BY:                     Tracy L. Brown
                                 Certified Registered Reporter
                                 tbrown567@comcast.net

_____

ACCURATE STENOTYPE REPORTERS, INC.
2894-A REMINGTON GREEN LANE
TALLAHASSEE, FLORIDA  32308
www.accuratestenotype.com
(850) 878-2221

APPEARANCES:

REPRESENTING THE DEBTOR:

ALLEN TURNAGE, ESQUIRE
2344 Centerville Road, Suite 101
Tallahassee, FL  32317


REPRESENTING JOHN BELL:

ALBERT PENSON, ESQUIRE
PENSON LAW FIRM PA
2810 Remington Green Circle
Tallahassee, FL 32308


REPRESENTING THE TAYLORS:

JAMES DONOHUE, ESQUIRE
AUSLEY McMULLEN
123 South Calhoun Street
Tallahassee, FL  32301

INDEX

WITNESS                                          PAGE

    JAMES LEE SIMPSON


    Examination by Mr. Trustee                  4
    Examination by Mr. Donohue                 28
    Examination by Mr. Penson                  49
    Further Examination by Mr. Trustee         80
    Further Examination by Mr. Donohue         87
    Further Examination by Mr. Penson          90




CERTIFICATE OF REPORTER                         93

4

1                PROCEEDINGS

2         **MR. TRUSTEE:**  This is the first meeting of the

3      creditors in the case of James Lee Simpson.  Case

4      number 15-40012.  I reviewed Mr. Simpson's Florida

5      driver's license and social security card and

6      confirmed that the information on those documents

7      is correct and returned those to him.

8         Mr. Simpson, at this time, please raise your

9      right hand for me.

10  Thereupon,

11            JAMES LEE SIMPSON

12  was called as a witness, having been first duly sworn, was

13  examined and testified as follows:

14             EXAMINATION

15  **BY MR. TRUSTEE:**

16     **Q**    Would you state your full name on the record for

17  us.

18     **A**    James Simpson.

19     **Q**    Mr. Simpson, is your mailing address the same as

20  it was on the day this case was filed, January the 9th of

21  2015?

22     **A**    Yes, sir.

23     **Q**    Did you read the information sheet provided to

24  you by the US Trustee?

25     **A**    Yes, sir.

1    **Q**    Are you employed other than on the farm?

2    **A**    No, sir.

3    **Q**    Did you read and then sign the petition,

4    schedules, and related documents Mr. Turnage prepared and

5    filed for you?  Did you read and then sign them?

6         **MR. TURNAGE:**  Everything that we went over?

7         **MR. SIMPSON:**  Yes.  Yes, sir.

8    **BY MR. TRUSTEE:**

9    **Q**    To the best of your knowledge, is the information

10   contained in them true and correct?

11   **A**    Yes, sir.

12   **Q**    Are you aware of any errors, omissions or changes

13   that you need to point out to me on the record this

14   morning?

15   **A**    No, sir.

16   **Q**    Are all of your assets and all of your debts

17   included in these documents?

18   **A**    Yes, sir.

19   **Q**    In the last eight years, were you involved in one

20   other bankruptcy case?

21   **A**    Yes, sir.

22   **Q**    That's the only other one?

23   **A**    Yes, sir.

24   **Q**    Okay.  That was another Chapter 12, was it not?

25   **A**    Yes, sir.

1     **Q**    Your Schedule A shows a home and 92 acres in

2 Havana with a value of about $450,000 and a debt of about

3 the same.

4     **A**    Yes, sir.

5     **Q**    It also shows a rental house that is your rental

6 house, but your son lives in it?

7     **A**    No, sir.  It's my son's rental house.

8     **Q**    Okay.  But it's on your farm?

9     **A**    No, sir.  Has nothing to do with the farm.

10     **Q**    Does it have anything to do with you?

11     **A**    No, sir, other than the fact it belongs to him

12 and it's in my name.

13     **Q**    I see.  It's titled in your name?

14     **A**    Yes, sir.

15     **Q**    And the value of that property is 20,000?

16     **A**    Yes, sir.

17     **Q**    With a debt of 15,000?

18     **A**    Yes, sir.

19     **Q**    Okay.  But your son is making the payments on it?

20     **A**    He was.  He is not now.

21     **Q**    Are you making them now?

22     **A**    I will, but I haven't started yet.

23     **Q**    Is he still living there?

24     **A**    No, sir.

25     **Q**    Is anyone living there?

1    **A**    No, sir.

2    **Q**    Do you intend to rent the property?

3    **A**    No, sir.  It's a storage facility.

4    **Q**    Really?

5    **A**    Yes, sir.

6    **Q**    With a house on it?

7    **A**    The house is a storage.

8          **MR. TURNAGE:**  He's using it for --

9          **MR. TRUSTEE:**  Using it for storage?

10         **MR. TURNAGE:**  Right.

11         **MR. SIMPSON:**  Yes, sir.

12   **BY MR. TRUSTEE:**

13   **Q**    Okay.  I see.

14         Mr. Simpson, in the last four years, have you

15   had an ownership interest in any real estate besides

16   these two properties that we have just discussed?

17   **A**    No, sir.

18   **Q**    Okay.  Now, have you ever inherited anything?

19   **A**    No, sir.

20   **Q**    Have you transferred a balance on one credit card

21   to another or paid off any unsecured loan in the last

22   quarter of 2014?

23   **A**    No, sir.

24   **Q**    All right.  Have you transferred or given

25   anything of value to any family members, friends, insiders,

1  or business partners in the four years before you filed?

2      **A**   No, sir.

3      **Q**   Have you been in business, other than your

4  farming business, either as a sole proprietor, partnership,

5  corporation, or LLC?

6      **A**   Yes, sir.

7      **Q**   What other businesses have you had?

8      **A**   Havana Sod and Pallet.

9      **Q**   Is that owned 100 percent by you?

10      **A**   It's shown 100 percent by me, but it actually

11  belonged to my sons.

12      **Q**   How many sons do you have?

13      **A**   I have an adopted son and he's the only one I got

14  now.

15      **Q**   Okay.  Who are the owners of Havana Sod?  Is that

16  an LLC?

17      **A**   Yes, sir, it's LLC.

18      **Q**   And who are the members of it?

19      **A**   Right now it's Charles Brewer and Jimmy Simpson.

20      **Q**   Jimmy being your son.

21      **A**   No, sir, that's me.

22      **Q**   That's you.  So you have a half interest?

23      **A**   Yes, sir.

24      **Q**   Okay.  Does it have any value to it?

25      **A**   I really don't know.

9

1    **Q**    We'll come back to it in a minute.

2          Do you have an interest in a will, trust, or

3    estate of anyone else?

4    **A**    No, sir.

5    **Q**    Do you file your income tax returns?

6    **A**    Yes, sir.

7    **Q**    Okay.  And is the income tax return that you

8    provided to me, which is the 2013 return, a true and

9    correct copy of the return that you filed with the Internal

10   Revenue Service?

11   **A**    Yes, sir.

12   **Q**    And will you be prepared to file your 2014 return

13   timely?

14   **A**    Yes, sir.

15   **Q**    You expect to have that filed by the middle of

16   April, April 15th?

17   **A**    Yes, sir.

18   **Q**    Okay.  In your old return for 2013, you actually

19   ended up owing the government a little bit?

20   **A**    Yes, sir.

21   **Q**    Do you expect to receive a refund on your 2014

22   return?

23   **A**    No, sir.

24   **Q**    Do you have any money or other assets that you

25   put back, stashed away, or saved up anywhere?  Any money,

1   cash, anywhere?  In the backyard?

2   **A**   No, sir.

3   **Q**   In the safe?

4   **A**   No, sir.

5   **Q**   Any money that's not disclosed on your petition?

6   **A**   No, sir.

7   **Q**   In your petition itself on Schedule B2, you

8   showed an interest in a checking account at Tallahassee

9   State Bank of $3,000 and that's pretty much it?

10   **A**   Yes, sir.

11   **Q**   Any other money that you're aware of?

12   **A**   No, sir.

13   **Q**   Okay.  Excellent.  Have you transferred or given

14   anything of value to anyone to hold or use for you?

15   **A**   No, sir.

16   **Q**   Have you been involved in any accidents where you

17   were hurt?

18   **A**   No, sir.

19   **Q**   Are you currently involved in a lawsuit or a

20   claim that you have brought against someone else?

21   **A**   No, sir.

22   **Q**   Do you have a suit or claim you could bring but

23   you have not done so?

24   **A**   No, sir.

25   **Q**   Are you under any court orders, Mr. Simpson, to

1    pay alimony, child support, or separate maintenance fees?

2         **A**    No, sir.

3         **Q**    Have you ever been divorced?

4         **A**    No, sir.

5         **Q**    Do any attorneys other than Mr. Turnage represent

6    you?

7         **A**    No, sir.

8         **Q**    Have you bought any lottery tickets in the last

9    year?

10        **A**    No, sir.

11        **Q**    Well, you can't win if you don't play.

12        **A**    I realize that.

13        **Q**    And you can't lose either, can you?  There you

14   go.

15             Now, do you have a passport?

16        **A**    No, sir.

17        **Q**    Have you ever had a passport?

18        **A**    Yes, sir.

19        **Q**    When was the last one?  Your passport has

20   expired?

21        **A**    Yes, sir.

22        **Q**    For how long?

23        **A**    That I'm not sure of.  It was mid '70s.

24        **Q**    So you haven't been out of the country since

25   then?

1    **A**    No, sir.

2    **Q**    Mr. Simpson, in the Schedule A, the values that

3    you placed on the real estate, primarily the house and 92

4    acres, was that value as a result of an appraisal that you

5    have done or was this a tax appraisal?

6    **A**    I think it was a tax appraisal.  At this point in

7    time, there is an appraisal that will be done.  The

8    gentleman contacted me yesterday.

9    **Q**    To appraise the house and the 92 acres?

10   **A**    Yes, sir.

11   **Q**    Are you going to appraise the rental house or you

12   pretty sure you pretty much know what that's worth?

13   **A**    I pretty well know what it's worth.

14   **Q**    Okay.  It's not worth more than 20 grand in your

15   opinion?

16   **A**    No, sir.

17   **Q**    Okay.  That's fine.

18         All right.  You've disclosed just nominal

19   clothing, jewelry, guns, that sort of thing?

20   **A**    Yes, sir.

21   **Q**    You have stock in Wattmizer, LLC.  What is that,

22   sir?

23   **A**    It's an electrical company.

24   **Q**    What does it do?

25   **A**    It is basically doing nothing now.  It hasn't

1    done anything for a year.  We did a lot of surveys.  And at

2    the end of two years on those surveys, they should come

3    back to the company and possibly end up with more work for

4    the company.

5        Q    And you install what?

6        A    It's energy saving equipment.

7        Q    Like what?  Like solar stuff?

8        A    No, sir, it's -- how do I tell you?  The magnetic

9    forces in motors and things like that create a loss, and

10   you can fix them, put a piece of equipment on it and save

11   the loss on it.  You can increase the life expectancy of it

12   plus lower the maintenance on it and save money on

13   utilities.

14       Q    Okay.  In Schedule B13, you listed your interest

15   in that LLC.  And that is what, you have a one-third

16   interest with son, Gary and Charles?

17       A    Yes, sir.

18       Q    Okay.  You own some electrical, analytical

19   equipment, that's in addition to the Wattmizer; is that

20   right?

21       A    No, sir.

22       Q    That's included in the 10,000?

23       A    Yes, sir.

24       Q    So of the 10,000, six of that is the equipment?

25       A    Yes, sir.

1     **Q**    Okay.  All right.  Let me draw a line there.

2         All right.  Havana Sod and Pallet, LLC, but we

3  don't really -- that's pretty much an unknown at the

4  moment?

5     **A**    Yes, sir.

6     **Q**    It doesn't own any real estate?  Does it lease

7  property?

8     **A**    It's a working lease.  It's not a lease lease.

9     **Q**    Is it on the 92 acres?

10    **A**    There is a lease with Havana Sod to Jimmy

11  Simpson.

12     **Q**    All right.  But there is additional property that

13  you intend to grow sod on?

14    **A**    Yes, sir.

15    **Q**    How many acres do you intend to grow sod on?

16    **A**    300.

17    **Q**    To be leased all in Florida?

18    **A**    Yes, sir.

19    **Q**    And near where you live?

20    **A**    Yes, sir.

21    **Q**    All right.  In addition to those assets we just

22  talked about, do you still have the Mac truck?

23    **A**    Yes, sir.

24    **Q**    Worth about six grand?

25    **A**    Yes, sir.

1      **Q**      And the other items that you listed in here, I

2   think Mr. Turnage put a total gross value of about 75,000?

3      **A**      Yes, sir.

4      **Q**      Are there liens on all of those pieces of

5   equipment?

6      **A**      No, sir.

7      **Q**      Are they free and clear?

8      **A**      Yes, sir.

9      **Q**      If you were to liquidate them today, do you think

10   you could get $75,000 for them?

11      **A**      Given today's -- it'd be hard.

12      **Q**      But would you -- in other words, if we were doing

13   a liquidation analysis from a Chapter 7 standpoint, if I

14   were the 7 trustee in the case, do you think I could sell

15   them and get 50 to 75 out of it?

16      **A**      Probably.

17      **Q**      Okay.  All right, sir.  Then you've got -- what

18   is -- is it Topos Theos (phonetic)?

19      **A**      Topos Theos is the farm, 92 acres.

20      **Q**      That's your home farm?

21      **A**      That is my home farm.

22      **Q**      Okay.  Let me put that down.

23          What is the name of the farm that you will be

24   leasing?  Is there like the Jones Place?

25      **A**      There's a Ponderosa Five, which is 80 acres on

1   it.  There's Sweet Water Branch, which is 43 acres.

2      **Q**   All these small?

3      **A**   Yes, sir.

4      **Q**   So you don't have to go through all of them.

5      Have you entered into lease agreements with

6   the owners?

7      **A**   There are verbal agreements that have been going

8   on for several years.

9      **Q**   When are the lease payments due?

10     **A**   Upon the harvesting of the grass on that land.

11     **Q**   When would that be?

12     **A**   When it's ready.  Other than that, I can't give

13  you an answer.

14     **Q**   I understand.  I've had several sod farmers

15  before and I guess some different types mature at different

16  times.  But the best time is around May or June?

17     **A**   May to June and following right on straight

18  through.  If everything goes right, you can rotate it

19  through the year once you get things.

20     **Q**   But you would still be obligated to maintain that

21  property, and do you -- you have irrigation?

22     **A**   Yes, sir.

23     **Q**   On all of it?

24     **A**   No, sir.

25     **Q**   On any of it?

1      **A**    Yes, sir.

2      **Q**    Okay.  Fertilizer?

3      **A**    Yes, sir.

4      **Q**    My recollection from one of my last ones was

5   you -- there's all kinds of stuff you've got to do.  I

6   mean, you have test it, you have to be sure the weeds don't

7   come up through it.

8      **A**    Right.

9      **Q**    You have to be sure that you're selling -- I

10  mean, the type of the sod that you're growing is the type

11  of sod people want to buy.

12     **A**    Correct.

13     **Q**    And, Mr. Simpson, there was a big case years ago

14  involving seed, not involving you, but in Georgia there was

15  something where sometimes farmers would get ahold of this

16  seed that was some kind of hybrid seed --

17     **A**    Yes, sir.

18     **Q**    -- that had a patent on it?  And they didn't know

19  it did.  Are you involved in any of that?

20     **A**    No, sir.

21     **Q**    All right.  So the seed that you have is from

22  where?

23     **A**    It's regeneration growing.  It's no seed involved

24  in it.

25     **Q**    So the sod is already growing now, it's just

1    dormant?

2        **A**    Correct.

3        **Q**    When it comes back to life in the spring -- in

4    the summer, that's what you will be selling?

5        **A**    Correct.

6        **Q**    Do you have the cutters and machinery to actually

7    cut it?

8        **A**    Yes, sir.

9        **Q**    Do you have anybody working for you?

10       **A**    No, sir.

11       **Q**    Would you do it all yourself then, you and --

12       **A**    No, sir.  It will be contracted out with other

13   people.

14       **Q**    I'm sorry.  But you wouldn't cut it until you

15   have an order; is that right?

16       **A**    Correct.

17       **Q**    And when you cut it, you cut it in rows, don't

18   you?

19       **A**    Yes, sir.

20       **Q**    And you leave enough on the sides for the rows to

21   grow back together; is that right?

22       **A**    Yes, sir.

23       **Q**    Okay.  How many of the acres that you intend to

24   farm as a sod farmer are irrigated?

25       **A**    Our 60 acres.

1      Q      Just 60 acres at the house?

2      A      There are 43 acres on another farm that is

3   irrigated.  That's it.

4      Q      Okay.  So you just really depend on the rain --

5      A      Yes, sir.

6      Q      -- on the rest of it and hope for the best?

7      A      Yes, sir.

8      Q      And sometimes you can have too much rain, can't

9   you?

10     A      Yes, sir.

11     Q      All right.  So Eula Young (phonetic) has a

12   mortgage on the rental house; is that correct?

13     A      Yes, sir.

14     Q      And is that current?

15     A      Yes, sir.

16     Q      Mr. Bell has a mortgage on the house and the

17   92 acres on Salem Road; is that right?

18     A      Yes, sir.

19     Q      Is that current?

20     A      No, sir.

21     Q      That's disputed?

22     A      Yes, sir.

23     Q      Okay.  Let's see, Mr. and Ms. Taylor, where are

24   they -- are they a second mortgage on --

25     A      They're a first.

1   Q   They're a first on the 92?

2   A   Yes, sir.

3   Q   Okay.  And Mr. Bell is a second?

4   A   Yes, sir.

5   Q   Are the Taylors current?

6   A   No, sir.

7   Q   All right.  What was their operating -- what was

8   your agreement with them?  It's a deed to secure debt and a

9   note that you pay monthly or annually or how?

10   A   On the last Chapter 12, we had an annual payment

11   and I failed to make it five years ago.  And when I

12   realized I had not made it, I wrote them a letter and told

13   them that I intend to pay for it, but I did not at that

14   point in time do it.

15   Q   So the annual payment for which year is the last

16   payment they received?

17   A   '08.

18   Q   And the annual payment to them is how much?

19   Scheduled payment was how much?

20   A   I don't recall.

21   Q   It's like 10,000 -- annual payment of 10,000 --

22   A   It was more than that.

23   Q   Between 10 and 20, you think?

24   A   Yes, sir.

25   Q   So '08 was paid up?

1    **A**    Yes, sir.

2    **Q**    So we haven't paid '9, '10, '11, '12, '13, '14?

3    **A**    Yes, sir.

4    **Q**    And it's due when?  End of the year, first of the

5    year, when?

6    **A**    End of the year.

7    **Q**    And it's not conditioned on your production, is

8    it?

9    **A**    No, sir.

10   **Q**    Was it a sod farm before or did you make it into

11   one?

12   **A**    It was a sod farm when we bought it.

13   **Q**    So the Taylors were sod farmers to begin with?

14   **A**    Yes, sir.

15   **Q**    They sold it to you?

16   **A**    Yes, sir.

17   **Q**    Got it.

18        Now, the taxes are current except for about

19   $100 to Gadsden County?

20   **A**    No, sir.  All the taxes are current.

21   **Q**    You have paid that now?  The ad valorem taxes?

22   **A**    Yeah, all the tax that we've been --

23        **MR. TURNAGE:**  I think I scheduled that as a

24   nominal amount just to get them a notice in case

25   there were any unpaid taxes.  Because we've got a

1      couple of properties, different iterations, so I

2      just wanted to make sure they had notice.

3           **MR. TRUSTEE:**  Okay.

4  **BY MR. TRUSTEE:**

5      **Q**    The only unsecured creditors you have other than

6  possibly under secured creditors would be your Sears

7  MasterCard, about 8900.  And that's also listed as

8  disputed.

9      **A**    Yes, sir.

10     **Q**    What's the dispute with Sears?

11     **A**    I went in to purchase a generator, ready to pay

12 for it.  The lady told me that if I would take a credit

13 card out, that it would save me money and that they would

14 do it.  And then when she got me to accept a credit card,

15 she also got me to take an insurance policy on it.  And the

16 insurance policy was that if you could not make payments on

17 it, it would make payments on it.

18     **Q**    Is that like a disability policy?

19     **A**    I would assume.  It was not disability, it was

20 unable to pay for it is all it was.  And the payments were

21 made on the thing for a year.  And then I missed a payment.

22 You know, I missed two payments and they started on it.

23 And I told them to use the insurance on it and they told me

24 that I did not have insurance, that when I missed a

25 payment, it lapsed.

1    **Q**    It's an unsecured claim, though; is that right?

2    **A**    Yes, sir.

3    **Q**    You didn't sign any kind of security agreement on

4    the generator?

5    **A**    No, sir.

6    **Q**    Because that would have been a business debt,

7    right?

8    **A**    Yes, sir, it was.

9    **Q**    Now, you were in business last year, too, right?

10    **A**    Yes, sir.

11    **Q**    And from an eligibility standpoint, let me just

12    knock this out of here for us, you are an individual family

13    farmer; is that right?

14    **A**    Yes, sir.

15    **Q**    You are actively engaged in a farming operation?

16    **A**    Yes, sir.

17    **Q**    Are your debts, which I know they are, but just

18    confirm, that your debts are below $4 million?

19    **A**    Yes, sir.

20    **Q**    Okay.  Did at least half of your income for last

21    year arise out of your farming operation?

22    **A**    Yes, sir.

23    **Q**    All right.  And are at least half of your debts

24    farm related?  Are at least half of them farm related?

25    **A**    Yes, sir.

24

1    **Q**    Well, all of them are, aren't they?  I mean, in

2    the sense that the land is farm related?

3    **A**    Right.

4    **Q**    And the generator was farm related, right?

5    **A**    Right.

6    **Q**    Okay.  Now, are there any judgments outstanding

7    on you now --

8    **A**    No, sir.

9    **Q**    -- that you're aware of?

10         All the federal taxes have been paid?

11   **A**    Yes, sir.

12   **Q**    And those liens have been released; is that

13   right?

14   **A**    Yes, sir.

15   **Q**    In fact, I saw a lien release -- well, actually I

16   saw a filing, a federal tax lien filing in March of last

17   year for 21,000, but has that been paid?

18   **A**    Yes, sir.

19   **Q**    So all state and federal taxes have been paid?

20   **A**    Yes, sir.

21   **Q**    Okay.  Now, insofar as your plan is concerned,

22   you've got a while to go on that.  We do have -- you're

23   working on summary of operations.  The only profit you

24   intend to pursue in 2015 would be sod?

25   **A**    Yes, sir.

1    **Q**     No other source of income from your farm?

2    **A**     No, sir.

3         **MR. TRUSTEE:**  And, Al, I guess you'll do a

4    liquidation analysis for us?

5         **MR. TURNAGE:**  I will and I'll include it in

6    the plan.

7         **MR. TRUSTEE:**  Okay.  And we can all take a

8    look at that.

9    **BY MR. TRUSTEE:**

10   **Q**     The only check that I saw of any significance

11   that was over the amount, which is about $5,800 now,

12   within -- was actually -- I think it was actually outside

13   the 90-day period, but there was a check to -- no, you paid

14   Internal Revenue Service in September.  Who is Mr. Savage,

15   Rick Savage?

16   **A**     He's an attorney.

17   **Q**     Okay.  What does he do?  What was he doing for

18   you?

19        **MR. TURNAGE:**  He was defending the

20   foreclosure.

21   **BY MR. TRUSTEE:**

22   **Q**     So that's what that was, attorney fees?

23   **A**     Yes, sir.

24   **Q**     All right.  Now that we have done that, let me --

25        **MR. TRUSTEE:**  Did y'all do a title opinion

1    last time, do you remember, or are you going to do

2    one?

3         MR. TURNAGE:  We're not going to do one.

4    We're going to have the appraisal done.  I think

5    that we litigated Mr. Bell's issue last time.  And

6    I think we're sort of resolved that he is, in fact,

7    a secured creditor.  So, you know, that's why we're

8    having the farm appraised so we can see what the

9    value is on that second mortgage.

10   **BY MR. TRUSTEE:**

11        **Q**    Mr. Simpson, is your given name James Lee

12   Simpson?  That is your correct and legal name?

13        **A**    Yes, sir.

14        **Q**    Okay.  All right.  May I have a phone number if I

15   need to get in touch with you, please, sir?

16        **A**    (850)509-2957.

17        **Q**    2957.  Okay.  And that's one that you keep with

18   you?

19        **A**    Yes, sir.

20        **Q**    Okay.

21        **A**    Well, other than the fact I don't have it right

22   now.

23        **Q**    They probably wouldn't let you.

24        Okay.  And I know --

25        **MR. TRUSTEE:**  Al, I noticed on Schedule C, you

1    claimed the homestead exception, but there really

2    isn't any equity in this?

3        MR. TURNAGE:   Right.  But there's case law

4    that say whether you claim it or not, it's -- you

5    might as well use it because we can't claim the

6    personal property exempt if he owns the home.

7        MR. TRUSTEE:   Okay.  But you're thinking from

8    a practical standpoint, there probably really

9    isn't?

10       MR. TURNAGE:   There probably isn't.  Depending

11   on where the appraisal comes in, of course.

12       MR. TRUSTEE:   All right.  Mr. Donohue, you are

13   representing the Bells?

14       MR. DONOHUE:   No, I represent the Taylors, the

15   first mortgage holders.

16       MR. TRUSTEE:   The Taylors.  I'm sorry.

17   Who are you representing?

18       MR. PENSON:   John Bell.

19       MR. TRUSTEE:   Mr. Bell.

20       Okay.  Any one else want to make an appearance

21   in the case?

22       Okay.  Since you brought the court reporter,

23   you want to go first?

24       MR. DONOHUE:   Makes no difference to me.

25       MR. TRUSTEE:   Okay.  Go ahead, please, sir.

1        **MR. DONOHUE:**   Thank you.

2                         EXAMINATION

3   **BY MR. DONOHUE:**

4        **Q**   Mr. Simpson, my name's Jim Donohue.   I represent

5   the Taylors that have a first mortgage on this 92 acres you

6   own.

7             Tell me again -- I'm going to cover some of

8   the ground.   I'm going to try not to duplicate effort,

9   but explain to me how you came up with $450,000 value

10  for the property you own.

11       **A**   That's the appraised value by the county, I

12  think.

13       **Q**   The tax assessed value?

14       **A**   Correct.

15       **Q**   How do you reconcile that with the fact that when

16  you filed two years ago, it was valued by you at $650,000?

17  Was that the tax value at that time?

18       **A**   I have no idea.

19       **Q**   But you filed those schedules where it was valued

20  at that; is that correct?

21       **A**   Yes, sir, I did.

22       **Q**   Okay.   And you're having it appraised now?

23       **A**   Yes, sir.

24       **Q**   Who is that?

25       **A**   Who is?

1    **Q**    Who's the appraiser?

2    **A**    I have no idea.  Because I've got two men that

3    are supposed to meet with me this afternoon.

4    **Q**    How did you get with these folks?  They just --

5    they get with you or you get with them?

6    **A**    No, I called them.  I was given names by other

7    people to call and I called five people.  And out of the

8    five, these two answered my call and returned my call.

9    **Q**    Okay.  And who were they?

10    **A**    I don't have it with me right now.

11    **Q**    Are they from Tallahassee?  Where are they from?

12    **A**    They're from Tallahassee.

13    **Q**    Okay.  And so it's your intention to get an

14    appraisal done by one of these gentleman; is that correct?

15    **A**    Yes, sir.

16    **Q**    Okay.  Explain to me, again, how the -- how you

17    derived income for the sod business given the involvement

18    of Havana Sod and Pallet and Topos Theos and you

19    individually, how do the dollars flow within that

20    arrangement?

21    **A**    Topos Theos is the farm.  It belongs to Jimmy

22    Simpson.  Havana Sod and Pallet does not belong to Jimmy

23    Simpson, it belongs to the group.  And they lease the

24    property from Jimmy Simpson.  And with the -- when they

25    harvest grass, for every pallet, they pay a percentage of

1  it to Jimmy Simpson.

2      **Q**    Okay.  What percentage do they pay per pallet?

3      **A**    7.5.

4      **Q**    7.5 percent.  And what's a pallet selling for

5  now?

6      **A**    $70.

7      **Q**    Okay.  And that's true whether the sod is

8  harvested off part of the 92 acres that is your homestead

9  or whether it's off of any of this leased property?

10     **A**    Just on the homestead.

11     **Q**    I'm sorry?

12     **A**    Just on the homestead.

13     **Q**    Oh, okay.  Well, what's the arrangement you -- do

14  you derive income from the leased property?

15     **A**    No, I do not.

16     **Q**    You do not?

17     **A**    No, I do not.

18     **Q**    Okay.  So your income of $8500 a month in your

19  schedules, net income, is from harvesting sod off of the

20  92 acres?

21     **A**    I don't know where you got the number from.  I

22  don't know the number --

23     **Q**    I got it from your schedules that you signed.  I

24  think you indicated earlier you reviewed and signed them

25  and they're accurate.

1          Got income of -- net business income from

2    Havana Sod is $8500.

3          How many pallets would that be to derive that

4    type of monthly income?

5      **A**    I don't think that's a monthly income.

6      **Q**    Well, I'm sorry.  I don't have any other numbers

7    to go by.  What would that number be in your Schedule I of

8    income?  You're listing social security at $1,000 a month?

9      **A**    Yes, sir.

10     **Q**    And net business income from Havana Sod at $8500

11   a month net, for total income of $9,500 a month.

12     **A**    Can I ask, is that --

13          **MR. DONOHUE:**  That's what the numbers --

14          **MR. SIMPSON:**  That's what the numbers showed?

15          **MR. DONOHUE:**  When we looked through your

16     profit and loss from last year, that's what that

17     showed.

18          **MR. SIMPSON:**  Okay.  Then that's where it's

19     at.

20   **BY MR. DONOHUE:**

21     **Q**    Now, what numbers were you and Mr. Turnage

22   looking at?  What was your profit and loss?  Did you

23   prepare that yourself?

24     **A**    No, sir.

25     **Q**    Who prepared that?

1       **A**     I don't know where it came from.

2              **MR. TURNAGE:**  Didn't Charlie do that for you?

3       I mean, somebody looked at your books, looked at

4       the income that you had and, you know, you brought

5       me the sheet that just said profit and loss.

6              **MR. SIMPSON:**  Okay.  That profit and loss came

7       from a bookkeeper.

8   **BY MR. DONOHUE:**

9       **Q**     And who would that bookkeeper be?

10      **A**     Leona Brewer.

11      **Q**     And who is she?  Is she related to anybody?

12      **A**     She's a bookkeeper.

13      **Q**     She related to anybody?

14      **A**     Yeah, she's related to my stepson.

15      **Q**     How so?

16      **A**     She's his mother.

17      **Q**     Okay.  So Leona Brewer prepared a profit and loss

18  for Havana Sod Company?

19      **A**     Yes.  But that's not Jimmy Simpson's profit and

20  loss if it's Havana and Sod profit and loss.

21      **Q**     No, you're indicating personal income from Havana

22  sod of $8500.  That's my question.  I'm trying to figure

23  out how your income went from $2,000 a month in your filing

24  less than two years ago from sod business to 400 percent

25  more than that less than two years later.  That's what I'm

33

1    trying to reconcile.

2         **A**    I don't know the answer to it right now.

3         **Q**    Okay.  But you did sign these schedules and you

4    did review them, and so this is, to the best of your

5    knowledge, this is all accurate?

6         **A**    Yes, sir.

7         **Q**    Okay.  And that profit and loss statement that

8    Leona Brewer prepared, that would be available if we were

9    to ask you to produce that?

10        **A**    Yes, sir.

11        **Q**    Okay.  What else does Leona Brewer do for you?

12        **A**    Nothing.

13        **Q**    Does she keep any records for your accounting of

14   your business -- of your farming business?

15        **A**    She's the bookkeeper for it, yes.

16        **Q**    Okay.  So she would have been listed in -- in

17   your statement of financial affairs, she would have

18   information on your business?

19        **A**    Not on my personal now.

20        **Q**    My question is about your personal.

21        **A**    Okay.  No.  On my personal, she does not have.

22        **Q**    Okay.  Who has those records?

23        **A**    That would be my CPA.

24        **Q**    You have a CPA?

25        **A**    Yes, sir.

34

1    Q    Okay.  In your statement of financial affairs,

2    you say that there's no one that has those records.  You

3    don't list anybody.  You say none.  Who is your CPA?

4    A    Earl Lyons.

5    Q    Where is he located?

6    A    Tallahassee.

7    Q    And how long has he been your CPA?

8    A    Thirty years.

9    Q    He prepares your federal income tax return every

10   year?

11   A    Yes, sir.

12   Q    Okay.  He's the one that's going to have your

13   2014 filed by April 15th?

14   A    He's going to have it filed.  I don't know what

15   day he's going to file it.

16   Q    I'm sorry.  I thought the Trustee asked you

17   earlier if it was going to be filed by April 15th.

18   A    He asked me do I think I would and I said, yes, I

19   think it would be.

20   Q    So you think it will be --

21   A    Yes, sir.

22   Q    -- but you're not sure?

23        So just as a general question, I mean, has

24   your income from the sod business increased fourfold

25   since your filing two years ago?

1     **A**     The sod business has increased and the harvesting

2     of Topos Theos has been at least 50 percent.

3     **Q**     50 percent of what?

4     **A**     The 60 acres.

5     **Q**     Okay.  I need to make sure I understand what

6     you're saying.  You're harvesting 50 percent of the -- the

7     60 acres is what has sod on it on the 92 acres; is that

8     correct?

9     **A**     That's correct.

10    **Q**     Okay.  So 50 percent of the 60 acres, that was

11    harvested, what, last year?

12    **A**     Yes, sir.

13    **Q**     Okay.  And now come spring and early summer, that

14    50 percent's going to be ready to be harvested again

15    100 percent?

16    **A**     Not that 50, but the other 50.

17    **Q**     The other 50.  Okay.  So the 50 percent that was

18    harvested in 2014, that's going to take how long to

19    regenerate before you can harvest it again?

20    **A**     It should be ready by the end of '15.

21    **Q**     Okay.  And so the 50 percent -- so 30 acres of

22    sod generated $8500 in net income a month for you in 2014;

23    is that your testimony today?

24    **A**     I don't know those numbers and I don't know

25    whether that is my testimony or not without knowing how it

36

1   happened.

2      **Q**   So really your testimony today is you're not sure

3   where this number came from on your schedules; is that

4   correct?

5      **A**   That is correct.

6      **Q**   Okay.  All right.  So going back to Havana Sod

7   and Pallet, that's owned by your son --

8      **A**   Yes, sir.

9      **Q**   -- is that correct?

10     Okay.  And so they harvest the sod off of the

11  60 acres on the 92 acres that's your homestead?

12     **A**   Correct.

13     **Q**   And you get 7 and a half percent of the price of

14  a pallet for every pallet that's cut off your property?

15     **A**   That's correct.

16     **Q**   And it's $70 a pallet now?

17     **A**   Yes, sir.

18     **Q**   Okay.  And that's the sole source of your income

19  in the sod business?

20     **A**   Yes, sir.

21     **Q**   Okay.  So what is this leased property you have?

22  Or that -- tell me about the leased property.

23     **A**   The leased property is Havana Sod and Pallet's

24  lease.

25     **Q**   So that's got nothing do with this bankruptcy

37

1   case?

2       **A**     That is correct.

3       **Q**     Okay.  So the leases are not an issue in this

4   case?

5       **A**     No, sir.

6       **Q**     So we're talking about 60 acres of sod on your

7   92 acres as your sole income as a farmer in this Chapter

8   12?

9       **A**     Yes, sir.

10      **Q**     Okay.  And that 60 acres is irrigated?

11      **A**     Yes, sir.

12      **Q**     You testified earlier, I believe, that you have a

13  checking account at Tallahassee State Bank?

14      **A**     Yes, sir.

15      **Q**     Is that the only account you've got at this time?

16      **A**     Yes, sir.

17      **Q**     Is that the only account you've had for the last

18  two years?

19      **A**     Yes, sir.

20      **Q**     Is there someone at that bank that you bank with?

21      **A**     No, sir.

22      **Q**     Do you have any loans at that bank?

23      **A**     No, sir.

24      **Q**     Do you have any banking relationship or a line of

25  credit anywhere where you can obtain money if you need to

38

1    for your farming operations?

2         **A**    No, sir.

3         **Q**    You do not?  Okay.

4              So you operate essentially on your cash flow?

5         **A**    Yes, sir.

6         **Q**    The 1989 Chevy 2500 pickup truck that's listed in

7    your schedule, is that the same pickup truck you had in

8    your last case?

9         **A**    Yes, sir.

10        **Q**    Okay.  And you drive that every day?

11        **A**    Well, not every day, but mostly every day.

12        **Q**    Is that how you got here today?

13        **A**    No, sir.

14        **Q**    How'd you get here today?

15        **A**    I drove a car.

16        **Q**    Whose car was that?

17        **A**    Belongs to my son.

18        **Q**    But you do drive the Chevy pickup truck?

19        **A**    Yes, sir, I do.

20        **Q**    I'm sorry?

21        **A**    Yes, sir.

22        **Q**    What kind of car does your son have?

23        **A**    An '04 Cadillac.

24        **Q**    Does your son live with you?

25        **A**    No, sir.

1    Q    How did you arrive at the amount of John Bell's

2  claim?

3         MR. DONOHUE:   You're going to get into that, I

4     guess, aren't you?

5         MR. PENSON:   Probably.

6  BY MR. DONOHUE:

7    Q    Just quickly, how did you arrive at the amount of

8  his claim on your schedule?

9         MR. TURNAGE:   I think I took it right off the

10     filing from the last case.

11        MR. DONOHUE:   Okay.   But the last case, we

12     went through a lot of that claim.

13  BY MR. DONOHUE:

14   Q    You signed a note to pay money to Mr. Bell a

15  number of years ago secured by a mortgage; is that correct?

16   A    No, sir.

17   Q    You did not sign that?

18   A    No, sir, I did not.

19   Q    Okay.

20        MR. DONOHUE:   Are we going to litigate this

21     again or --

22        MR. TURNAGE:   Nope.

23        MR. DONOHUE:   So we're not going to have an

24     issue about the mortgage in this case?

25        MR. TURNAGE:   I don't --

1        MR. DONOHUE:  We can go through it again.

2        MR. TURNAGE:  Well, I don't know why it would

3   be in the interest of the Taylors to be involved in

4   that litigation at all, but it would be -- I think

5   the Court determined, despite Mr. Simpson's

6   testimony, that there is, in fact, a mortgage.  So

7   I don't think we're going to -- I wouldn't find any

8   benefit in relitigating that issue.

9        MR. DONOHUE:  It has a very large impact on my

10  client from the standpoint of the size of secured

11  claims overall in the case and feasibility of the

12  plan, but that's an issue to come up later.

13  BY MR. DONOHUE:

14      Q   How do you arrive at the amount of the Taylors'

15  claim at 200,000?

16      A   I don't think that's where we're at, is it?

17       MR. TURNAGE:  It's something like that.  I

18  mean, and, again, I think I took it off the claims

19  register from the last case, but --

20       MR. DONOHUE:  But I think, since the last

21  case, there's been a final judgment entered in a

22  much larger amount.

23  BY MR. DONOHUE:

24      Q   Are you familiar -- and you testified earlier you

25  didn't have any final judgments again.  You're familiar

1   with the final judgment in the foreclosure case brought by

2   the Taylors, are you not?

3       **A**    No, sir.

4       **Q**    You're not.  All right.  Let me ask you

5   something, I've got a copy of this.

6           **MR. DONOHUE:**  Mr. Trustee, if you'd like to

7       have a copy of the --

8           **MR. TRUSTEE:**  What is it?

9           **MR. DONOHUE:**  It's a judgment that was entered

10      in a foreclosure case.

11  **BY MR. DONOHUE:**

12      **Q**    Mr. Simpson, this is my understanding of a

13  judgment that was entered on November 2nd in Gadsden County

14  Circuit Court.  And oddly enough, it's got your signature

15  on it that you stipulated to it there on the last page.  Is

16  that not your signature?

17      **A**    I can't tell you.

18      **Q**    So your testimony today is you don't know whether

19  you signed that or not?

20      **A**    That is not any signature, no, sir.

21      **Q**    Okay.  Was Rick Savage your attorney in that

22  case?

23      **A**    Yes, he was.

24      **Q**    So Rick Savage should know whether or not that's

25  your signature or not, would you think?

42

1      **A**    Yeah, I would say so.

2      **Q**    Okay.  All right.  I'll take that back, that

3   judgment.

4          Were you aware that a judgment was entered

5   against you in that case?

6      **A**    Yes, sir.  No, I was not aware there was a

7   judgment entered against me.  Mr. Savage told me that y'all

8   had taken care of things and that this piece of paper

9   needed my signature on it.  That is not my signature, but

10  there was a piece of paper with my signature on it.

11     **Q**    What piece of paper had your signature on it?

12     **A**    The one that he put down in front of me.

13     **Q**    Was that to wrap up the foreclosure?  You lost me

14  on that.  What piece of paper did Mr. Savage ask you to

15  sign?

16     **A**    I don't have it in front of me so therefore I

17  don't know.

18     **Q**    But you are aware that a judgment of foreclosure

19  was entered against you back in November of last year; is

20  that correct?

21     **A**    He did not tell me it was a foreclosure entered

22  into.  He told me that we were at a point that this needed

23  to be taken care of and that he was taking care of it with

24  the Court, and I would assume with you.

25     **Q**    All right.  So your testimony today is you're not

1   aware that a final judgment and foreclosure in the amount

2   of $255,000 plus what was entered against you in Gadsden

3   County Circuit Court last fall?

4       **A**   Now, I knew that there was $255,000 that were due

5   and I agreed to that, yes, I did.

6       **Q**   Okay.  But my first question was, your schedules

7   reflect an amount due to the Taylors of $200,000.  Should

8   that not be $255,000?

9           **MR. TURNAGE:**  It should be.  I mean, certainly

10          we're not going to dispute the amount of the claim.

11          And I probably just carried it over from the old --

12          the prior petition.  But if the judgment amount is

13          255,000, we're not going to dispute that.

14          **MR. TRUSTEE:**  It wasn't appealed, was it?

15          **MR. TURNAGE:**  No.

16          **MR. TRUSTEE:**  It's a final judgment, right?

17          **MR. TURNAGE:**  Right.

18          **MR. TRUSTEE:**  Okay.

19  **BY MR. DONOHUE:**

20      **Q**   Okay.  And I may have asked this earlier, but

21  real quickly, with your income from your sod operation

22  being as high as it is now, the 8500 a month and 2,000 a

23  month from your earlier filing and yet the value of the

24  property in your new schedules have decreased the value by

25  $200,000, how do you explain that?

1      **A**      By taking the value that the county put on it.

2      **Q**      So the increase production of the sod doesn't

3 have an indication of value?

4      **A**      Has nothing to do with it.

5      **Q**      Has nothing do with it.  Okay.  Good.

6           Now, in your Schedule J, you indicate a $1500

7 payment to IRS every month.  Is that for current taxes?

8      **A**      I don't have a payment to IRS for $1,500 a month.

9           **MR. TURNAGE:**  That's the self-employment tax

10           like Mr. Kelly noted, there's a check to the IRS

11           from out of his bank records.  So that's --

12           **MR. DONOHUE:**  I don't know what the amount of

13           that check is.  Is that for the 21,000?

14           **MR. TRUSTEE:**  When was that, Mr. Simpson?

15           I'll be glad to look that up.  There's a check to

16           the Internal Revenue Service for $2,001 that was

17           for his personal taxes for 2013.  That check was on

18           September the 19th.

19           **MR. SIMPSON:**  That is one payment.  That's not

20           per month.

21           **MR. TURNAGE:**  And then you had the $21,000 tax

22           lien that you paid, right?

23           **MR. SIMPSON:**  No.  That tax lien was pulled

24           off by the IRS because someone had entered into my

25           IRS account and fraudulently the IRS was charging

1    me for it and therefore other things were happening

2    with other companies.

3         **MR. TRUSTEE:**  I do notice that on April the

4    9th of last year, you paid Internal Revenue Service

5    $1,862.19 for your 2012 taxes.

6         **MR. SIMPSON:**  Right.

7         **MR. TRUSTEE:**  So your 2012 and your 2013 taxes

8    appear to be paid up.

9         **MR. SIMPSON:**  Yes, sir.

10         **MR. TRUSTEE:**  But were there other taxes that

11   you must pay monthly?

12         **MR. SIMPSON:**  No, sir.

13         **MR. TRUSTEE:**  So can we just eliminate that,

14   or are you anticipating you're going to have

15   other --

16         **MR. SIMPSON:**  No, sir.

17         **MR. TRUSTEE:**  -- other taxes that you need to

18   escrow --

19         **MR. SIMPSON:**  No, sir.

20         **MR. TRUSTEE:**  -- over the year?

21         Okay.  All right, sir.

22   BY MR. DONOHUE:

23         **Q**    So there was a release of the IRS lien recorded

24   with regard to your property?

25         **A**    Yes, sir.

46

1    **Q**    Okay.  So that's of record?

2    **A**    I didn't know it was on the property.

3    **Q**    I assumed it was if you're saying there was --

4    I'm hearing an IRS lien.

5        **MR. TRUSTEE:**  There was one according to my

6        Lexis report that --

7        **MR. DONOHUE:**  Is that reflecting the release

8        of that lien?

9        **MR. TRUSTEE:**  Yeah, let me look and I'll tell

10        you.  It did not reflect a payment but that doesn't

11        mean there wasn't one.  There is a release of a

12        $9,000 one that they put in in 2008.  They did

13        release that.  But the tax lien according to the

14        Lexis report is still on record in Gadsden County.

15        Looks like it's number 14000-1712, so you may want

16        to look into that if it's been paid.

17        Did you pay $21,000?

18        **MR. SIMPSON:**  No, sir.

19        **MR. TURNAGE:**  I'll check on that tax lien.  I

20        didn't know about that.

21        **MR. TRUSTEE:**  Allen, it just says federal tax

22        lien.  It's book 786, page 137 in Gadsden County

23        Circuit Court filed by the Internal Revenue

24        Service.

25    **BY MR. DONOHUE:**

47

1    **Q**    But your testimony today is you do have a written

2    release from the IRS from that tax lien?

3    **A**    No, I do not have a written release.

4    **Q**    What do you have from the IRS indicating that

5    that -- that there was fraud involved and that there's not

6    a lien?

7    **A**    My accountant's word.  And I would assume that he

8    had papers on it.

9    **Q**    Now, in your statement of financial affairs,

10   paragraph one, it asks for the gross amount of income you

11   received.  And yet for 2014, you have net receipts from sod

12   sales.  What was your gross receipts from sod sales in

13   2014?

14   **A**    I have no idea.

15   **Q**    Who would have an idea of that, your CPA?

16   **A**    Yes, sir.

17   **Q**    And your CPA has all of your accounting

18   information on your farm operation for the last 30 years?

19   **A**    I would assume.

20   **Q**    Okay.  Let me see.  That may be all I've got.

21           The payments on the mortgage on the house

22   owned by your son, you're going to be undertaking those

23   in the future?

24   **A**    Yes, sir.

25   **Q**    What are those?  How much of those?

1      **A**    500 a month.

2      **Q**    500 a month.  And when do you begin making those?

3      **A**    In July, I think.

4      **Q**    Let's go back to Leona Brewer just for a minute.

5      She's your --

6      **A**    Bookkeeper.

7      **Q**    Huh?

8      **A**    Bookkeeper.

9      **Q**    Bookkeeper.  So she would have documents,

10     accounting documents, on your operation as well if she's

11     your bookkeeper?

12     **A**    Are you talking about my personal?

13     **Q**    That's just for the sod company.

14     **A**    That's just for the sod company.

15     **Q**    But that information would indicate what was

16     remitted to you individually from the sod company; is that

17     correct?

18     **A**    Yes, it would.

19     **Q**    Okay.  And how do I get -- where is she located?

20     **A**    North Carolina.

21     **Q**    Whereabouts in North Carolina?

22     **A**    I don't have that information right now.

23     **Q**    Do you have a phone number for her?

24     **A**    Don't have that either right now.

25     **Q**    You don't have an address?

1      **A**    No, sir.

2            **MR. DONOHUE:**  Allen, is that something you can

3      get for me?

4            **MR. TURNAGE:**  Sure.

5  **BY MR. DONOHUE:**

6      **Q**    How do you communicate with her?

7      **A**    She calls me on the telephone.

8      **Q**    She calls you.  Do you ever call her?

9      **A**    No, sir.

10     **Q**    So she just gets with you when she wants to and

11     you don't have any --

12     **A**    When she needs to.

13     **Q**    So you don't know how to get in touch with her?

14     **A**    I can find out how to get in touch with her, but

15     I don't have it with me.

16     **Q**    All right.  That's information you can get your

17     attorney and he can get it to me?

18     **A**    Right.

19     **Q**    Okay.  All right.

20           **MR. DONOHUE:**  I think that's all the questions

21     I've got.  I may have a followup in a minute,

22     but --

23           **MR. TRUSTEE:**  Mr. Penson.  Yes, sir.

24                       EXAMINATION

25  **BY MR. PENSON:**

1    Q    Mr. Simpson, as you know, I represent John Bell.

2    A    Right.

3    Q    When the Trustee asked you what your full name

4    was, you said James Simpson.

5    A    Yes, sir.

6    Q    Then when Mr. Donohue asked you, you said -- you

7    confirmed it was actually James Lee Simpson.  So which is

8    it?  Which is your full name?

9    A    You want my full name?

10   Q    Yes, your full name.

11   A    James Allex Lee Simpson is the way it's shown on

12   my birth certificate.

13   Q    And what's the middle name?  What's the second

14   name you said?

15   A    Lee.

16   Q    All right.  James Lee Simpson.

17   A    My birth certificate shows James Allex Lee

18   Simpson.

19   Q    And Allex is spelled how?

20   A    A-L-L-E-X.

21   Q    And you're also known as James L. Simpson?

22   A    I'm probably known by Jimmy Simpson.

23   Q    Have you signed documents as James L. Simpson?

24   A    Yes, sir, I have.

25   Q    And this issue about how you got here today, you

1    said you drove a 2004 Cadillac?

2        **A**    Yes, sir.

3        **Q**    All right.  And you said your son owns it?

4        **A**    Yes, sir.

5        **Q**    All right.  And which son is that?  Your stepson

6    or your --

7        **A**    Gary.

8        **Q**    Gary?

9        **A**    Yes, sir.

10       **Q**    All right.  Is Gary still alive?

11       **A**    No, sir.

12       **Q**    All right.  When did Gary die?

13       **A**    July.

14       **Q**    So between the time that -- let's see, prior to

15    the filing of these schedules, Gary was deceased?

16       **A**    Prior to the filing?

17       **Q**    Yeah, you filed your schedules January 9th,

18    correct?

19       **A**    Yes, sir, he was deceased.

20       **Q**    All right.  So any reference to Gary having an

21    ownership interest in anything listed on your schedules is

22    not really accurate, is it?

23       **A**    It has not been determined as of this time who

24    owns it.

25       **Q**    All right.  Who would have claims to it?

1    **A**    Probably myself on it.

2    **Q**    So the 2004 Cadillac is likely to be inherited by

3    you, correct?

4    **A**    Yes.

5    **Q**    All right.  And have you transferred the title to

6    you on that 2004 Cadillac yet?

7    **A**    Nope.

8    **Q**    And why haven't you transferred the title yet?

9    **A**    Because I'm with an attorney who is looking at

10   the way that I'm going to set up a will and that kind of

11   thing.

12   **Q**    And who is that attorney?

13   **A**    I don't have that number -- name with me right

14   now.

15   **Q**    So you don't know the name of the attorney that

16   you've consulted regarding setting up an estate for you?

17   **A**    No, I do not.

18   **Q**    Okay.  Where does that attorney work?

19   **A**    Tallahassee.

20   **Q**    What's the address?

21   **A**    I have no idea right now.

22   **Q**    Have you ever visited that attorney?

23   **A**    Yes, sir, I have.

24   **Q**    All right, sir.  Where did you visit that

25   attorney?

53

1      **A**      Off of John Knox Road.

2      **Q**      All right.  And if you came in John Knox Road

3  from North Monroe and turned onto John Knox Road, would his

4  office -- is it a male or female?

5      **A**      Male.

6      **Q**      All right.  Would his office be on the right or

7  on the left?

8      **A**      On the right.

9      **Q**      And when did you last visit that attorney?

10     **A**      Three weeks ago.

11     **Q**      Do you have any correspondence from that

12 attorney?

13     **A**      No, sir.

14     **Q**      Have an engagement letter?

15     **A**      No, sir.

16     **Q**      Have you paid the attorney any money?

17     **A**      No, sir.

18     **Q**      All right.  And with regard to the property that

19 was your son Gary's, you say that you're using that home as

20 a storage facility, correct?

21     **A**      Yes.

22     **Q**      All right.  What's being stored there?

23     **A**      Lumber.

24     **Q**      All right.  And who owns the lumber?

25     **A**      It's been provided by other people, so I guess

54

1    the house owns it.

2        **Q**    The house that you own the property on which the

3    house sits?

4        **A**    Yes.

5        **Q**    Okay.

6        **A**    Well, yeah.  Yes.

7        **Q**    And how much lumber is there?

8        **A**    Probably 20, 30 pieces.

9        **Q**    And where did the lumber come from?

10       **A**    It was from a building that was torn down.

11       **Q**    And what building was that?

12       **A**    I have no idea.

13       **Q**    All right.  Who put the lumber in the storage

14   facility?

15       **A**    Charlie Brewer.

16       **Q**    What's the purpose of that lumber?  What's it

17   going to be used for?

18       **A**    Some repairs on the building.

19       **Q**    And by the building, you're referring to the

20   storage facility on a property that you owned?

21       **A**    Correct.

22       **Q**    Okay.  Mr. Donohue asked you a little bit about

23   the foreclosure action by the Taylors.  And you're familiar

24   with that foreclosure action, right?

25       **A**    Yes, sir.

1    **Q**   All right.  And you filed your petition on

2  January 9th, 2015, correct?  Your petition for

3  bankruptcy?

4    **A**   Yes.

5    **Q**   And you're aware that your home was to be sold on

6  January 13th as part of that foreclosure sale, right?

7    **A**   Yes, sir.

8    **Q**   When the Trustee asked you about whether you were

9  holding any moneys or had any moneys other than what you

10  listed in your schedules, you hesitated.  Is there some

11  moneys out there that you aren't sure how to tell the

12  Trustee whether it's yours or not?

13    **A**   No, sir.

14    **Q**   Okay.  So you don't have any money other than

15  what's listed in the schedules, right?

16    **A**   Correct.

17    **Q**   Not in your pocket?  Not at the house?  Not in

18  the storage facility?

19    **A**   No, sir.  No, sir.

20    **Q**   Now, how about Mr. Savage, have you paid a

21  retainer to him?  Does he have any money in trust for you?

22    **A**   No, sir.

23    **Q**   The lease that somebody has with you for the

24  property used -- for the 60 acres, all right, who did you

25  lease the 60 acres to you for the purpose of sod

56

1    production?

2         **A**    Havana Sod.

3         **Q**    And is that Havana Sod and Pallet, Inc., Havana

4    Sod and Pallet, LLC, or what is it?

5         **A**    It's Havana Sod and Pallet, d/b/a.

6         **Q**    D/b/a what?

7         **A**    (Shrugs.)

8         **Q**    She can't take down a shrug.  You've got to tell

9    me.

10        **A**    Doing business as.

11        **Q**    All right.  And who's doing business as Havana

12   Sod and Pallet?

13        **A**    Who is doing business with them?

14        **Q**    Yes.  No, as Havana Sod and Pallet?

15        **A**    I don't understand the question.

16        **Q**    All right.  Who owns Havana Sod and Pallet?

17        **A**    I do.

18        **Q**    So you're leasing the property to yourself?

19        **A**    No, sir.  Havana Sod and Pallet is -- has a lease

20   with Topos Theos.

21        **Q**    And you own Topos Theos, right?

22        **A**    Yes, sir, I do.

23        **Q**    All right.  And Topos Theos is not an entity, is

24   it?  It's not registered with the State of Florida?

25        **A**    It is not registered, no, sir.

1    **Q**    Okay.  So Topos Theos is really James Lee

2   Simpson, right?

3    **A**    Personal property, yes, sir.

4    **Q**    All right.  So we have a structure started here

5   where we have James Lee Simpson owns the property, right?

6    **A**    Yes, sir.

7    **Q**    James Lee Simpson goes by the name of Topos

8   Theos, or is it Theos Topos?

9    **A**    Topos Theos.

10    **Q**    All right.  So you have Topos Theos is a

11   fictitious name, although it's not registered as a

12   fictitious name for Jimmy Lee Simpson.  Topos Theos then

13   has a lease with Havana Sod and Pallet, which Jimmy Lee

14   Simpson owns also?

15    **A**    No, sir.  Jimmy Lee Simpson owns a piece of it,

16   but only as a director in it.  Charlie Brewer and Gary

17   Simpson own the company itself.  And Jim Simpson had a

18   third of it.

19    **Q**    All right.  So Jimmy Simpson had a third of it.

20   Gary Simpson's deceased.  You're likely to inherit from

21   Jimmy -- I'm sorry, Gary Simpson.  So at this point in

22   time, Gary Brewer, who is your stepson, as I understand

23   it --

24    **A**    Correct.

25    **Q**    -- owns one-third and you own two-thirds?

1    **A**    No, sir.  Until it's determined -- he could end

2  up owning the whole thing.

3    **Q**    All right.  But what is it that he owns?

4    **A**    Havana Sod and Pallet.

5    **Q**    But it's not --

6    **A**    Active company.

7    **Q**    In what name, Inc.?

8    **A**    LLC.

9    **Q**    There's no corporate registration for Havana Sod

10  and Pallet, LLC?

11    **A**    No, because it comes under the Wattmizer, LLC.

12    **Q**    All right.  So now we add another level, right?

13    **A**    Yes, sir.

14    **Q**    So we have Wattmizer, which is owned by Jimmy Lee

15  Simpson?

16    **A**    That's correct.

17    **Q**    All right.  So Jimmy Lee Simpson owns Havana Sod

18  and Pallet, all right, and there is no registration for

19  that fictitious name for Wattmizer, is there?  There's not

20  a fictitious name registration with the State of Florida

21  for Wattmizer doing business as Havana Sod and Pallet?

22    **A**    I -- my CPA handles that.  I don't know.

23    **Q**    All right.  So if we take this structure all the

24  way up to Wattmizer, who's writing the checks to Jimmy --

25  for James Lee Simpson for the sod?  I'm sorry, for the

1   lease?

2       **A**    Havana Sod and Pallet.

3       **Q**    And does Havana Sod and Pallet have its own

4   checking account?

5       **A**    Yes, they do.

6       **Q**    All right.  And who runs that checking account?

7       **A**    Who writes checks on it?

8       **Q**    Who signs the checks?

9       **A**    Jimmy Simpson.

10      **Q**    And that's you?

11      **A**    That's correct.

12      **Q**    So you sign the checks that go to you for Havana

13  Sod and Pallet, which is some business name that's not

14  registered with the State of Florida, correct?

15      **A**    Right.

16      **Q**    But according to your testimony, Wattmizer is the

17  one who actually owns Havana Sod and Pallet?

18      **A**    Correct.

19      **Q**    So let's take it another step and talk about

20  income.  All right.  If Havana Sod and Pallet, which is

21  really Wattmizer, which is really you, sells that sod that

22  comes off your lease --

23      **A**    Okay.

24      **Q**    -- who gets the money from the people who buy it?

25      **A**    I didn't follow that.

1    Q    All right.  You have a lease for sod, right?

2    A    Who is "me"?

3    Q    Jimmy Lee -- James Lee Simpson.

4    A    James Lee Simpson, okay.

5    Q    Right.  Because that sod is coming off your

6  60 acres --

7    A    Correct.

8    Q    -- right?  Or which only 30 acres was farmed in

9  2014?

10    A    Okay.

11    Q    And while we're on that, and I don't want to

12  confuse you, but how many pallets do you get per an acre?

13    A    I don't know at this point.

14    Q    What did you get?  Historically, what would it

15  be?

16    A    I don't know.

17    Q    How long have you been in this business?

18    A    A while.

19    Q    And you don't know how many pallets are produced

20  per acre as we sit here today?

21    A    No, sir.

22    Q    Can't even fathom a guess?

23    A    No, sir.

24    Q    What's your experience been as far as how many

25  pallets come off of an acre?

61

1     **A**     I don't know that number.

2     **Q**     All right.  Who would know that number for 2014?

3     **A**     Probably the bookkeeper.

4     **Q**     And this would be Leona Brewer?

5     **A**     Yes.

6     **Q**     All right.  And she's the bookkeeper for Havana

7  Sod and Pallet, which is owned by Wattmizer, which is you,

8  James Lee Simpson?

9     **A**     Correct.

10    **Q**     Okay.  All right.  Back to the original question.

11 If Havana Sod and Pallet leases 30 acres from you?

12    **A**     Yes, sir.

13    **Q**     Then Havana Sod and Pallet harvests the 30 acres

14 of sod; is that correct?

15    **A**     That's correct.

16    **Q**     All right.  Then what does Havana Sod and Pallet

17 do with that sod?

18    **A**     They sell it.

19    **Q**     All right.  And to whom do they sell it?

20    **A**     To you if you want to buy it.

21    **Q**     All right.  Who else do they sell it to?

22    **A**     To anyone here it wants to.

23    **Q**     Do they have contracts to produce sod for people?

24    **A**     No, they do not.

25    **Q**     So how do they market it?

1      **A**     There are contractors who utilize the sod on a

2   steady basis.  How did they market?  Word of mouth, I would

3   think.

4      **Q**     All right.  So who are some of the buyers of

5   Havana Sod and Pallet sod?

6      **A**     I would have to go look at it.  I don't know

7   right now.

8      **Q**     Just give me one.

9      **A**     Mike Long.

10     **Q**     And what does Mike Long do?

11     **A**     He's a -- he's a contractor that -- he's a

12   grading contractor.

13     **Q**     All right.  So let's say that Mike Long pays

14   Havana Sod and Pallet for the sod.  Is that how that would

15   work?

16     **A**     That would work that way.

17     **Q**     Okay.  And then how does Havana Sod and Farm --

18   I'm sorry, Havana Sod and Pallet account for those sales?

19   Where's the money go?

20     **A**     It goes into the bank.

21     **Q**     And is that in a Havana Sod and Pallet account?

22     **A**     Yes, it is.

23     **Q**     All right.  But Havana Sod and Pallet doesn't

24   exist except through Wattmizer, correct?

25     **A**     Correct.

63

1    Q    And you own Wattmizer?

2    A    Correct.

3    Q    All right.  So does Wattmizer have an account?

4    A    No.

5    Q    Wattmizer doesn't have a bank account?

6    A    No.

7    Q    All right.  So the income that Wattmizer received

8    in 2014 and that was used to pay you, according to the

9    income in your schedule, where'd that money come from?

10   A    The sale of sod.

11   Q    So Wattmizer pays you for the sod?

12   A    No.  Havana Sod and Pallet paid Jimmy Simpson for

13   the grass that was taken off the farm.

14   Q    Where's the bank account for the Havana Sod and

15   Pallet?

16   A    I'm not following you.

17   Q    What bank is Havana Sod and Pallet --

18   A    Capital City.

19   Q    That's at Capital City?

20   A    Yes, sir.

21   Q    All right.  And that's the one that you write

22   checks on?

23   A    Correct.  I don't write checks on it.

24   Q    You sign checks on it?

25   A    I sign checks.

64

1    **Q**    Who writes the checks?

2    **A**    Terry Manning.

3    **Q**    Who's Terry Manning?

4    **A**    She is the lady who answers the telephone.

5    **Q**    For whom does she answer the phone?

6    **A**    Havana Sod and Pallet.

7    **Q**    What else does she do?

8    **A**    I don't understand the question.

9    **Q**    Well, when I asked you who wrote the checks you

10 told me Terry Manning.

11    **A**    Yes, sir.

12    **Q**    I said, Who is she, and you said she's the one

13 who answers the phone.  But she also appears, by your

14 testimony, to write the checks.

15    **A**    Right.

16    **Q**    All right.  So what else does she do?  She make

17 deposits?

18    **A**    Yes, sir.

19    **Q**    And who pays her?

20    **A**    Havana Sod and Pallet.

21    **Q**    Did Wattmizer file a tax return for 2013?

22    **A**    Yes, sir.

23    **Q**    Did Wattmizer file a tax return for 2014?

24    **A**    No, sir.

25    **Q**    Do you intend to file one for Wattmizer for 2014?

1   **A**   Yes, sir.

2   **Q**   All right.  And what income would there be for

3   Wattmizer in 2014?

4   **A**   I don't understand the question.

5   **Q**   Well, you're going to file a tax return for

6   Wattmizer in 2014, correct?

7   **A**   The CPA will, yes, sir.

8   **Q**   Okay.  And what income did Wattmizer have in 2014

9   for which the return will be filed?

10   **A**   Whatever was derived from Havana Sod and Pallet.

11   **Q**   Did Havana Sod and Pallet file a tax return for

12   2013?

13   **A**   Through Wattmizer, yes, sir.

14   **Q**   All right.  And Havana Sod and Pallet will file a

15   2014 return through Wattmizer also?

16   **A**   Yes, sir.

17   **Q**   But Wattmizer doesn't have a bank account?

18   **A**   No, sir.

19   **Q**   The profit and loss statement that you get from

20   Leona Brewer, how is that transmitted to you?  By e-mail?

21   By mail?  How do you get it?

22   **A**   It would probably go straight to the CPA.

23   **Q**   Mr. Lyons?

24   **A**   Correct.

25   **Q**   You mentioned in response to the question from

1    the Trustee that you intend to lease up to 300 acres.  And

2    that would be, you mentioned Ponderosa Five was 80 acres,

3    Sweet Water Branch was 43.  What are the other sources of

4    that 300 acres?

5        **A**    Well, you got 60 acres on Topos Theos.

6        **Q**    All right.  So you're including that in the

7    300 acres?

8        **A**    Correct.

9        **Q**    All right.  How about the rest of it?

10       **A**    There are small plots that are personal owned by

11   different people that will be used.

12       **Q**    And who are those people?

13       **A**    I have no idea right now.

14       **Q**    Okay.  Who were they last year?

15       **A**    Tony Hillman had 30 acres.  And a 10-acre plot,

16   and I don't remember the man's name.

17       **Q**    Okay.  Who else?

18       **A**    That's it.

19       **Q**    So you didn't lease 300 last year, right?

20       **A**    No, sir.

21       **Q**    Okay.  How many did you lease last year?

22       **A**    Last year?

23       **Q**    Yes.

24       **A**    Probably 180 acres.

25       **Q**    Does Havana Sod and Pallet receive all of the

1    income from the sale of the sod?

2        **A**    I don't understand the question.

3        **Q**    All right.  If you lease 180 acres approximately

4    last year, all right, and I'm assuming you sold 180 acres'

5    worth of sod?

6        **A**    No, sir, I did not.

7        **Q**    Okay.  How many acres of sod did you sell?

8        **A**    Probably at the most 80 acres.

9        **Q**    So you only sold 80 acres out of 180 that was

10   leased?

11       **A**    That was leased and started farming.  Because, at

12   that point in time, the business started coming back alive

13   and that work ground is being worked for the future.

14       **Q**    And of that 80 acres, 30 of it was owned by you?

15       **A**    Correct.

16       **Q**    All right.  So out of the 80 acres that was sold,

17   did Havana Sod and Pallet receive income for that?

18       **A**    When they sold the grass, they received the check

19   for it, yes, they did.

20       **Q**    And was that check deposited into a Havana Sod

21   and Farm -- I'm sorry, Havana Sod and Pallet account?

22       **A**    Yes, it was.

23       **Q**    All right.  And then were you paid your

24   7.5 percent of the pallets from that account?

25       **A**    Off the Topos Theos, yes.

1    **Q**    Okay.  So you got your 7.5 percent off the 30

2    acres that Topos Theos leased to Havana Sod?

3    **A**    Correct.

4    **Q**    Now, you have an ownership interest in Wattmizer,

5    correct?

6    **A**    Correct.

7    **Q**    And Wattmizer owns Havana Sod, correct?

8    **A**    Correct.

9    **Q**    All right.  Did you receive any moneys from

10   either Havana Sod or Wattmizer based on your ownership

11   interest?

12   **A**    No, I did not.

13   **Q**    All right.  Did Havana Sod have a profit for

14   2014?

15   **A**    I don't know yet.

16   **Q**    Did they have a profit for 2013?

17   **A**    No, they did not.

18   **Q**    Did they have a loss?

19   **A**    Yes, they did.

20   **Q**    Okay.  And what was that loss?

21   **A**    I have no idea right now.

22   **Q**    So in your schedules when you refer to Havana Sod

23   and Pallet, Inc. there is no such thing, correct?

24   **A**    Never has been.  Well, I take it back.  There was

25   an Inc., but it hasn't been there for -- since John and I

1  separated.

2  **Q**    It was dissolved about 2009?

3  **A**    That's correct.

4  **Q**    Okay.  So, and then a reference to Havana Sod and

5  Pallet, LLC is incorrect also because that LLC does not

6  exist in the records of the State of Florida, correct?

7  **A**    Havana Sod and Pallet is carried under the LLC of

8  Topos Theos -- of Wattmizer.

9  **Q**    All right.  But Wattmizer hasn't registered to do

10  business as Havana Sod and Pallet, correct?

11  **A**    No, they have not.

12  **Q**    Okay.

13  **A**    That I'm aware of.  Now, there again, I told you

14  before, the bookkeeper -- or the accountant knows that.  I

15  don't.

16  **Q**    Now, does Topos Theos or Theos Topos file a tax

17  return?

18  **A**    No, sir.

19  **Q**    All right.  And you haven't personally registered

20  to do business as Topos Theos or Theos Topos?

21  **A**    No, sir.

22  **Q**    And on Schedule I of your schedules, you list

23  that you're employed but have no income.  Who employs you?

24  **A**    Wattmizer and Havana Sod and Pallet.

25  **Q**    And how are you employed by Wattmizer?  What's

1   your role there?

2      **A**   Advisor.

3      **Q**   When's the last you were compensated by

4   Wattmizer?

5      **A**   I can't recall.

6      **Q**   And just for clarification, how do you spell the

7   mizer in Wattmizer?

8      **A**   M-I-Z-E-R.

9      **Q**   So there's no M-I-S-E-R?

10     **A**   No.

11     **Q**   Okay.  And in Schedule J, those are your personal

12   expenses, correct?

13         **MR. TURNAGE:**  Yes.

14         **MR. SIMPSON:**  Yes.

15   **BY MR. PENSON:**

16     **Q**   All right.  And who would have the information

17   regarding the expenses of Havana Sod and Pallet which the

18   company Wattmizer, that you own, does business as?  Who

19   would have those expenses?

20     **A**   Ms. Brewer.

21     **Q**   All right.  But you sign the checks for those

22   expenses, correct?

23     **A**   Yes, sir.

24     **Q**   And those checks are prepared by -- I can't

25   recall her name.

1            **MR. TURNAGE:**  Terry Manning.

2  **BY MR. PENSON:**

3      **Q**    Terry Manning.  Thank you.

4            And where is the checkbook kept?

5      **A**    In the office.

6      **Q**    All right.  And which office is that?

7      **A**    Havana Sod and Pallet's office.

8      **Q**    All right.  And where is that located?

9      **A**    2926 Salem Road.

10     **Q**    Which is your home?

11     **A**    Correct.

12     **Q**    All right.  Is there a separate office outside of

13  your home?

14     **A**    Nope.  It's within the house, but it is a

15  separate office.

16     **Q**    Okay.  All right.  In your statement of financial

17  affairs, item number one, you list that $105,000 was the

18  2014 net receipts for sod sales; is that correct?

19     **A**    If that's what's on there, yes.

20     **Q**    Okay.  Now, who received that net receipts?  Was

21  that Havana Sod and Pallet or you?

22     **A**    If that was net to Topos Theos, I did.

23     **Q**    Well, it doesn't say.  It says there's 105,000

24  for 2014 net receipts from sod sales.  Who got the net

25  receipts, you or Havana Sod?

1      A    On '14?

2      Q    Yes.

3      A    It hasn't been disbursed yet.

4      Q    Where is it?

5      A    That I'm not sure of right now.

6      Q    Is it in the Havana Sod and Pallet bank account?

7      A    It could be, yes.

8      Q    The one that you sign checks for?

9      A    Yes.

10     Q    And the checkbook's in your office?

11     A    Yes.

12     Q    All right.  Deposits -- the record of deposits in

13   your office?

14     A    Yes.

15     Q    Bank statements come to your office?

16     A    No.

17     Q    Where do the bank statements go?

18     A    They go to Leona Brewer.

19     Q    Okay.  And that's the accountant at Capital City

20   Bank?

21     A    Correct.

22     Q    So did Jimmy Lee Simpson receive any moneys from

23   Havana Sod and Pallet in 2014?

24     A    Yes.

25     Q    All right.  And how much did Jimmy Lee Simpson

73

1  receive from Havana Pallet?

2      **A**    I don't know right now.

3      **Q**    Did they pay you by check?  Did it pay you by

4  check?

5      **A**    Yes, they would.

6      **Q**    Any other form of payment?

7      **A**    No.

8      **Q**    Does Havana Sod and Pallet make any cash sales?

9      **A**    Yes.

10      **Q**    All right.  And how would those be recorded?

11      **A**    As cash sales.

12      **Q**    And deposits to the Capital City Bank account?

13      **A**    Correct.

14      **Q**    In number four of your statement of financial

15  affairs, you list the lawsuit by the Taylors and you list

16  the lawsuit by Citibank.  And how much is Citibank suing

17  you for?

18          **MR. TURNAGE:**  I think that's an old -- I think

19      that's that Sears MasterCard.

20          **MR. SIMPSON:**  It is.

21  **BY MR. PENSON:**

22      **Q**    So that's the Sears MasterCard of $8,900 that's

23  in dispute?

24          **MR. TURNAGE:**  Right.

25  **BY MR. PENSON:**

74

1    **Q**    All right.  But you also have a lawsuit by John

2    Bell brought against you in Gadsden County on a suit on a

3    note, correct?

4    **A**    John Bell does have a suit against me, yes.

5    **Q**    And that was filed back in April 2014.  You

6    answered in August of 2014.  And is there any reason that's

7    not listed on this schedule four or item four of your

8    statement of financial affairs?

9    **A**    I don't have an answer for that.

10    **Q**    Okay.  And Rick Savage represents you in that

11    case, right?  Defending the action by Mr. Bell against you,

12    you've employed Rick Savage to represent you in that?

13    **A**    I don't know where I'm at with that.

14    **MR. TURNAGE:**  I don't either.

15    **BY MR. PENSON:**

16    **Q**    Other than the action by the Taylors, and based

17    on my representation to you that Rick Savage is handling

18    the case for you brought by Mr. Bell, does Mr. Savage

19    represent you in any other actions?

20    **A**    Not that I'm aware of.

21    **Q**    All right.  Do you have any money in his trust

22    account for handling these cases for you?

23    **A**    No, I do not.

24    **Q**    And has he been paid by you personally or by

25    Havana Sod and Pallet?

ACCURATE STENOTYPE REPORTERS, INC.

1    **A**    Personally.

2    **Q**    So then going back to your Schedule F, you don't

3  list Mr. Bell under that particular lawsuit and the note

4  that he's suing on is an unsecured nonpriority claim,

5  correct; you admitted that?

6    **A**    I don't know what you're talking about.

7        **MR. TURNAGE:**  We have it listed in Schedule D,

8    right?

9        **MR. PENSON:**  No.  You have the mortgage listed

10   in Schedule D, but you don't have the unsecured

11   note that he's suing on.

12       **MR. TURNAGE:**  I didn't realize -- I thought

13   there was one note that was secured by the

14   mortgage.

15       **MR. PENSON:**  No.  It's a $32,000 note,

16   separate note.

17       **MR. TURNAGE:**  Oh, I didn't know about that.

18       **MR. PENSON:**  That's not secured by the

19   mortgage.  That's the subject of that lawsuit.

20       **MR. TURNAGE:**  Oh.

21  **BY MR. PENSON:**

22    **Q**    And then how -- in Schedule D, you listed the

23  claim of Mr. Bell as a secured claim as 250,000.  How did

24  you come up with that amount?

25       **MR. TURNAGE:**  Well, that's based on the -- if

1    the farm is 450 and the Taylors' claim is 200,

2    which I now understand to be 250, then Bell's claim

3    would be the value over the -- between the -- over

4    the Taylors' claim.

5         **MR. PENSON:**  But if Mr. Bell has --

6  **BY MR. PENSON:**

7    **Q**    Mr. Simpson, if Mr. Bell has a note and mortgage

8  which at the time of your last Chapter 12 filing was

9  $784,838.56, then that's the amount of his secured claim,

10  correct?

11   **A**    I don't know where you're at.  I don't have an

12  idea.

13   **Q**    All right.  You aware that Mr. Bell filed a proof

14  of claim in your last Chapter 12?

15   **A**    No, sir.

16   **Q**    All right.  Are you aware that we litigated --

17   **A**    Yes, sir.

18   **Q**    -- the issue of whether or not that claim

19  constituted a second mortgage or not?

20   **A**    Yes, sir.

21   **Q**    And you're aware that the Court determined it

22  constituted a second mortgage, correct?

23   **A**    That I'm not aware of.

24   **Q**    Okay.  And you immediately dismissed your

25  bankruptcy after that ruling, correct?

1   **A**   Upon my attorney's advice is when we dismissed

2   it.

3   **Q**   All right.  So at least the secured claim should

4   be listed, and if there's a portion of that that's

5   unsecured, that should be listed as part of an unsecured

6   claim, correct?

7   **A**   I don't have any idea.

8   **Q**   Okay.  If you don't know that you actually have

9   $8500 per month in net income, and you don't know what the

10   distribution of the 105,000 from 2014's going to be, and

11   you don't know what the expenses are with regard to

12   generating the moneys that are used to pay you for your

13   sod, how do you represent to the Trustee and to the Court

14   that you're going to be able to pay anybody with regard to

15   this Chapter 12?

16   **A**   In meetings with our attorney, everything to the

17   attorney, we have arrived at the figures that we can take

18   care of the debt as shown that we're showing right now.

19   **Q**   But we're here today to find out how you can do

20   that, and you haven't given us one bit of information

21   despite the fact that you signed this under oath that you

22   can do that.

23   **A**   That is correct.

24   **Q**   All right.  So once again this was just a filing

25   to avoid the foreclosure that was happening four days

1  before -- after you filed, correct?

2  **A**    No, sir.

3  **Q**    Well, how do you reasonably expect to get this

4  done if none of these numbers are reliable and you can't

5  testify --

6  **A**    I don't know the numbers.

7  **Q**    No.  Let me finish, please.  And you can't

8  testify after signing these schedules under oath that those

9  are reliable numbers?  How can you expect for the Court and

10  the Trustee to believe that you can pull off a Chapter 12?

11  **A**    The numbers came from people who are generating

12  them numbers, which is the bookkeeper and the CPA.  And

13  they were given to the attorney and they were compiled

14  altogether and decided that these were the numbers that we

15  have worked and these are the numbers that we intend to

16  work in the future, and it come to enough to take care of

17  the debt.

18  **Q**    How much did you say that Havana Sod and Pallet

19  is selling a pallet of sod for?

20  **A**    $70.

21  **Q**    And out of that, you get 7.5 percent?

22  **A**    Correct.

23  **MR. PENSON:**  Please give me a minute.  They

24  took my phone, so I don't have a calculator.

25  **MR. TURNAGE:**  That's $5 a pallet if you round

1    down a little bit.  $5 and a quarter if you want to

2    be exact.   1600 pallets a month generates $8,000,

3    if that's where we're going.

4         **MR. PENSON:**  If you can give me just a minute.

5    **BY MR. PENSON:**

6    **Q**    I believe you testified you couldn't recall what

7    your mortgage payments were to the Taylors, but it was

8    somewhere between 10,000 and 20,000 per year; is that

9    correct?

10    **A**    Yes.

11    **Q**    And the only income that you're looking at to

12    support a Chapter 12 plan would be the lease payments to

13    you, or the 7.5 percent, of the $70 per pallet?

14    **A**    Correct.

15    **Q**    All right.  You aren't looking to any other

16    income to support that Chapter 12 plan, are you?

17    **A**    No.

18         **MR. TRUSTEE:**  Let me correct you on that,

19    because you do have social security income.

20         **MR. SIMPSON:**  Yes, sir, I do.

21    **BY MR. PENSON:**

22    **Q**    Other than the income from the lease and the

23    social security?

24    **A**    Right.

25    **Q**    You aren't looking at any income from any other

1  source to support your Chapter 12 plan?

2      **A**    That is correct.

3          **MR. PENSON:**  I don't think I have anything

4      further.

5          **MR. TRUSTEE:**  Okay.  Thank you, Al.  I've

6      looked at those.

7          **MR. TURNAGE:**  Donna said you wanted these, but

8      you don't want them?

9          **MR. TRUSTEE:**  I looked at what I needed.

10                       FURTHER EXAMINATION

11  **BY MR. TRUSTEE:**

12      **Q**    I did want to clarify a couple things, though.

13  The insurance policy that gave me that's valid through June

14  the 9th lists three vehicles, and I see only one of them on

15  your petition.  The one that is included in your petition

16  is a 1989 Chevrolet 2500.

17      **A**    Right.

18      **Q**    All right.  You have insurance on a 2002 GMC

19  Sierra 2500?

20      **A**    Yes.

21      **Q**    And you have insurance on a 2004 Cadillac.

22      **A**    Those are Gary's truck and car.

23      **Q**    Both of these are Gary's?

24      **A**    Yes.

25      **Q**    Okay.  And are those paid for?

1    **A**    Yes, sir.

2    **Q**    Did he have a will?

3    **A**    No, sir.

4    **Q**    Are you his only heir?

5    **A**    Yes, sir.

6    **Q**    So you at some point probably will have those

7    vehicles?

8    **A**    Well, there's a chance that I will not, because

9    it's according to how the attorney that's looking at the

10   will structures it, because it could end up going to

11   Charlie Brewer.

12   **Q**    Who is Mr. Brewer again?

13   **A**    He is my stepson.  Adopted son is what he is.

14   **Q**    Okay.  So am I correct that your insurance, all

15   insurance is paid up through June the 9th of 2015?

16   **A**    The --

17   **Q**    I know it is on the vehicles?

18   **A**    On the vehicles.

19   **Q**    Okay.

20   **A**    That is a monthly payment.  That is --

21   **Q**    I see.  But you are continuing to pay it monthly,

22   though?

23   **A**    Yes.

24   **Q**    And are those the only vehicles that we were not

25   aware of?  You know, Florida DMV I don't think ever takes a

1  vehicle out of your name.

2      **A**    Right.

3      **Q**    You know, if you ever had it.  So I see the '89

4  Chevrolet 2500.  Do you still have -- and also a trailer.

5  Do you have a 1987 Hooper trailer, a tilt tandem trailer?

6      **A**    No, sir.

7      **Q**    Is that gone, sold?

8      **A**    Yes, sir.

9      **Q**    Okay.  Do you have a 1986 Dodge D-350?

10     **A**    No, sir.

11     **Q**    That was sold or gone -- did you ever?

12     **A**    I can't remember ever having any.

13     **Q**    All right.  That's fine.

14          Did you have a Volkswagen?

15     **A**    Yes, sir, but I don't have it any longer.

16     **Q**    Sold?

17     **A**    Yes, sir.

18     **Q**    More than a year ago?

19     **A**    Yeah, long time ago.

20     **Q**    Okay.  That's fine.  And you had a motor home at

21  one time, right?

22     **A**    Yes, sir.

23     **Q**    And that's sold as well?

24     **A**    Yes, sir.

25     **Q**    Okay.  The only other business entity that showed

1   up on your potential business would be Simpson Electric

2   Service, Inc.

3       **A**   Yes, sir.

4       **Q**   Is that still in business?

5       **A**   No, sir.

6       **Q**   When did it go out of business?

7       **A**   I don't recall.  It's been at least 20 years ago.

8       **Q**   All right, sir.  But you intend to maintain

9   insurance on the three vehicles, at least until such time

10  as the estate is settled?

11      **A**   Yes, sir.

12      **Q**   And you have exclusive use of those vehicles?

13      **A**   Yes, sir.

14      **Q**   And on a followup on one of the questions

15  Mr. Penson asked on your Wattmizer income for 2013.

16      **A**   Yes, sir.

17      **Q**   I think your tax return showed a loss of $9,805,

18  if that is correct?

19      **A**   That is correct.

20      **Q**   Okay.  And is all --

21      **MR. TRUSTEE:**  Al, to determine eligibility,

22      what do we need to look at for 2014?  Do we look at

23      Wattmizer?

24      **MR. TURNAGE:**  You know, we ran into that in

25      Steve Walker's case where the IRS counts income to

1    an LLC as personal income.  So any gross receipts

2    of Wattmizer that come from the farm would -- you

3    know, would count --

4        **MR. TRUSTEE:**  Would come to him.

5        **MR. TURNAGE:**  -- as eligible dollars.

6    **BY MR. TRUSTEE:**

7        **Q**    So Wattmizer is -- it's an LLC?

8        **A**    Yes, sir.

9        **Q**    And just to be sure I've got these entities

10   right, the entities that are actually incorporated are

11   Wattmizer, LLC?

12       **A**    Yes, sir.

13       **Q**    But Mr. Penson says that that is not registered;

14   is that correct?

15       **MR. PENSON:**  I'm sorry?

16       **MR. TRUSTEE:**  Is Wattmizer, LLC --

17       **MR. PENSON:**  Wattmizer is registered with

18   Mr. Simpson as the sole member.

19       **MR. TRUSTEE:**  With the Florida Secretary of

20   State?

21       **MR. PENSON:**  Correct.

22   **BY MR. TRUSTEE:**

23       **Q**    Okay.  Then you've got Havana Sod and Pallet.

24       **A**    Yes, sir.

25       **Q**    And that is not registered?

1    **A**    No, sir.

2    **Q**    Okay.  So that's a d/b/a?

3    **A**    Yes.

4         **MR. PENSON:**  But it's not registered as a

5    d/b/a.

6         **MR. TRUSTEE:**  Okay.  But -- okay.  So it's

7    nothing?  It just a tradename, I guess.

8         And are there any other corporations or LLCs?

9         **MR. PENSON:**  Well, you have the Topos Theos.

10         **MR. TRUSTEE:**  Topos Theos.  All right.  But is

11    that registered with the Secretary of State?

12         **MR. PENSON:**  No.

13         **MR. TRUSTEE:**  Okay.

14         **MR. PENSON:**  But that's apparently what -- and

15    I'm paraphrasing what he told us, the Topos Theos

16    is his name that he uses for his farm that's owned

17    by him and he owns Topos Theos.

18  **BY MR. TRUSTEE:**

19    **Q**    So does everything go up under the umbrella of

20  Wattmizer?  Is everything reported under that at some

21  point?

22    **A**    The Topos Theos is Jimmy Simpson.

23    **Q**    Just you.

24    **A**    Is personal.  That's all there is to it.

25  Everything else is part of the business.

1    **Q**    All right.  So under Jimmy Simpson, personally,

2    we've got Topos Theos?

3    **A**    Yes, sir.

4    **Q**    Your own individual tradename?

5    **A**    Yes, sir.

6    **Q**    And what else?

7    **A**    Social security.  That's it.

8    **Q**    Social security.  And what about Havana Sod and

9    Pallet?  That's --

10   **A**    That comes under --

11   **Q**    Isn't that just you?

12   **A**    No, sir.  That's Charlie Brewer and it was Gary

13   Simpson.

14   **Q**    Okay.  But you never had an ownership interest in

15   that?

16   **A**    I have an ownership interest in it, which was

17   one-third.

18   **Q**    All right.  Was that your one-third to begin with

19   or was that Gary's one-third?

20   **A**    No.  Gary had a third, Brewer had a third, and

21   Jimmy had a third.

22   **Q**    Jimmy meaning yourself?

23   **A**    Yeah.

24   **Q**    You're talking in different persons.

25          Okay.  So now you have two-thirds if you got

1  it from Gary?

2      **A**   Well, I don't have it as of this time.

3      **Q**   Do you think it will?

4      **A**   No, sir, I don't expect to take the whole thing.

5          **MR. TRUSTEE:**  Well, it's quite complicated and

6      well beyond what we can do today, but we will.

7          Yes, sir, Jim.

8          **MR. DONOHUE:**  I just have a couple followups

9      based on some of the answers to Al's questions.

10                    FURTHER EXAMINATION

11  **BY MR. DONOHUE:**

12      **Q**   The Havana Sod, they own all the equipment that

13  does the harvesting of the sod?

14      **A**   Yes, sir.

15      **Q**   Okay.  How old is that equipment, generally

16  speaking?

17      **A**   I have no idea.

18      **Q**   All right.  But now Havana Sod is owned

19  100 percent by Wattmizer that you own 100 percent of,

20  right?  I mean, who looks after the equipment with Havana

21  Sod?  Who takes care of the maintenance of it and --

22      **A**   Charlie Brewer.

23      **Q**   And that's your adopted son?

24      **A**   Yes, sir.

25      **Q**   Okay.  Is this the same equipment you had in your

1  last bankruptcy?

2  **A**   I would say so, yes, sir.

3  **Q**   Okay.  And you've had for a while before that?

4  **A**   No, no, I wouldn't say that either, because I

5  don't know how much of it is and how much of it is not.

6  It's possible that a portion of it could be, but -- no, I

7  don't think so.

8  **Q**   But Charlie Brewer would be the person to talk to

9  to find out about the status of that equipment?

10  **A**   Yes, sir.

11  **Q**   Okay.  And from the standpoint of the -- your

12  farm that's being reorganized in this Chapter 12, it's

13  being managed by the same folks that managed your last 12?

14  There hadn't been any change in that?  It's just

15  essentially you; is that correct?

16  **A**   Yes, sir, that's correct.

17  **Q**   Okay.  And you're the only -- you make all the

18  decisions on the operation of your farm; is that correct?

19  **A**   No, sir.

20  **Q**   Who else makes those decisions?

21  **A**   Charlie Brewer will make decisions on it.

22  **MR. DONOHUE:**  Okay.  And, Allen, you're going

23      to get me a -- the address for the bookkeeper up in

24      North Carolina?

25  **MR. TURNAGE:**  I'll get you all of her contact

1      information.

2             **MR. DONOHUE:**   Okay.   That would be good.

3      **BY MR. DONOHUE:**

4      **Q**    And I think this is the last thing, but if I

5      remember correctly, the -- you derive 100 percent of your

6      income from the 60 acres on the 92 acres where you live?

7      Is it your personal --

8      **A**    And social security.

9      **Q**    I'm sorry, yeah, and social security.   But farm

10     income is from that.

11            And of that 92 acres, 60 of it is sod and 30

12     of it are being rehabbed during this year, won't be

13     ready till the end of the year?

14     **A**    There's 92 acres.   There's only 60 acres

15     producing.

16     **Q**    Right.

17     **A**    And 50 percent of it was harvested this last

18     year.

19     **Q**    Okay.

20     **A**    It will be ready -- the other 50 is ready to be

21     harvested this coming year.   And by the end of year, the

22     other 50 will be ready.

23     **Q**    Okay.   So you're going to be operating in 2015

24     starting now on the 50 percent or 30 acres that wasn't

25     harvested last year?

1    **A**    Correct.

2    **Q**    Okay.  And then the 30 that was harvested last

3  year will be ready to go towards the end of this year?

4    **A**    Yes, sir.

5    **Q**    But then the other 30 you harvested will take

6  what period of time to be rejuvenated?

7    **A**    Anything from eight to 12 months.

8    **Q**    Okay.  All right.

9        **MR. DONOHUE:**   Thank you.

10                    FURTHER EXAMINATION

11  **BY MR. PENSON:**

12    **Q**    One quick one.  You listed a whole bunch of

13  equipment in item 13 of your Schedule B.  And who actually

14  has title to the 1994 Mac semi-tractor?

15    **A**    Havana Sod.

16    **Q**    Is that the same for everything listed there, the

17  two 48-foot box trailers, the 2001 GMC --

18    **A**    The box trailers are not to Havana Sod, they are

19  leases that belong to -- I'd have to find out who they

20  belong to.

21    **Q**    All right.  So the box trailers that you have

22  listed, the two 48-foot box trailers that you placed a

23  value of 10,000 --

24    **A**    There's two of them.  Yes, sir, Havana Sod does

25  have them.

1     **Q**    All right.  What box trailers you talking about

2 that were leased?

3     **A**    There's four others.

4     **Q**    All right.  So then you have a 2001 GMC HD crew

5 cab pickup diesel.  Who owns that?

6     **A**    Havana Sod.

7     **Q**    All right.  Who owns the 2006 John Deere sod

8 harvester?

9     **A**    Havana Sod.

10     **Q**    What about the Massey Ferguson 6225 tractor?

11     **A**    Havana Sod.

12     **Q**    The Massey Ferguson tractor valued at $4,000?

13     **A**    Havana Sod.

14     **Q**    The 17-foot bush hog?

15     **A**    Havana Sod.

16     **Q**    The 1999 forklift?

17     **A**    Havana Sod.

18     **Q**    The 1998 forklift?

19     **A**    Havana Sod.

20     **Q**    The Ford Mastercraft forklift?

21     **A**    Havana Sod.

22     **Q**    Who owns the other junk equipment valued at

23 $1,000?

24     **A**    Havana Sod.

25     **Q**    Who owns the hand tools and equipment valued at

1    5,000?

2        **A**    Havana sod.

3        **MR. PENSON:**  That's all I have.

4        **MR. TRUSTEE:**  Okay.

5        Al, anything?

6        **MR. TURNAGE:**  Nope.

7        **MR. TRUSTEE:**  Okay.  Then we will conclude our

8    meeting of creditors.  Thank you for coming.  And

9    we look forward to working with y'all in this case.

10   Thank you.

11       (Hearing concluded at 11:41 a.m.)

12                    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

93

CERTIFICATE OF REPORTER


STATE OF FLORIDA:

COUNTY OF LEON:


         I, TRACY L. BROWN, court reporter and Notary Public do hereby certify that the foregoing proceedings were taken before me at the time and place therein designated, and that the foregoing pages numbered 1 through 93 are a true and correct record of the aforesaid proceedings.

         I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the foregoing action.

         DATED THIS 16th day of February, 2015.



                         _____
                         TRACY L. BROWN
                         2894-A Remington Green Lane
                         Tallahassee, FL   32308
                         (850) 878-2221

ACCURATE STENOTYPE REPORTERS, INC.